IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 22-CR-30138 |
| | ) |
| CHRISTOPHER LANGDON, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge**:

This matter is before the Court on the Government's motion to revoke the Defendant's bond (Doc. 48). On April 18, 2024, the Court held a hearing on the Government's motion. The Government presented a proffer of evidence and then offered argument in support of its request to revoke the Defendant's bond. The Defendant offered argument and asked the Court to deny the Government's motion and place the Defendant in a residential in-patient drug treatment facility. The Court took the matter under advisement. For the reasons explained below, the Government's motion (Doc. 48) is GRANTED.

## BACKGROUND

The Defendant is charged with Felon in Possession of a Firearm under 18 U.S.C. § 922(g)(1) and 924(a)(2) (Doc. 1). On December 28, 2022, the Defendant was released on bond and ordered to comply with certain bond conditions (*See* Docs. 7, 9). On April 4, 2024, the Government filed a motion to revoke the Defendant's bond (Doc. 48). This

1

motion to revoke prompted the issuance of an arrest warrant, which resulted in the arrest of the Defendant and his appearance in Court on the motion to revoke (*See* Docs. 49-53).

Under 18 U.S.C. § 3148(b)(1), which is the first step in any bond revocation proceeding, the Court must consider whether there is probable cause to believe the Defendant has committed a Federal, State, or local crime while on release; or whether there is clear and convincing evidence that the Defendant has violated any other condition of release. 18 U.S.C. § 3148(b)(1)(A)-(B). Here, the Defendant conceded all of the alleged violation conduct in the Government's motion, except for an allegation that he tested positive for fentanyl on February 12, 2024 (*See* Doc. 48, p. 2, Doc. 53). The Government orally moved to withdraw this allegation, thus alleviating the need for an evidentiary hearing on this issue (Doc. 53).

Accordingly, the Court will now summarize the violation conduct from the Government's motion and discussed at the hearing. First, the Defendant tested positive for cocaine on July 11, 2023, during a drug screening (Doc. 48, p. 2). On March 13, 2024, the Defendant failed to report to the Family Guidance Center in Springfield, Illinois for random drug testing, as required (Doc. 48, pp. 2-3). Following his failure to appear on March 13, the Probation Department contacted the Defendant's wife, who indicated that she would bring the Defendant to meet with his Pretrial Services Officer and submit to a drug test (Doc. 48). According to the Government's motion, the Defendant did appear on March 14 and was instructed to wait until his Pretrial Services Officer finished with Court (Doc. 48). The Defendant waited in the lobby for approximately 15 minutes and then left without meeting with his officer (Doc. 48). However, it appears that while he was at the

Probation Office on March 14, he submitted a urine sample because the Government's motion reveals that this sample later tested positive for cocaine metabolite (*See* Doc. 48, p. 4).

Ultimately, Probation secured a placement for the Defendant at "The Center" which is a residential treatment facility in East St. Louis, Illinois (Doc. 48). The Defendant was directed to appear on March 25, 2024 (Doc. 48). After failing to appear on time, personnel from Probation contacted the Defendant and, following intervention from Defendant's counsel, the Defendant finally reported to The Center, albeit three hours late (Doc. 48). At intake, the Defendant submitted a urine sample, which ultimately returned positive for cocaine metabolite and marihuana (Doc. 48).

The Defendant remained at The Center until April 1, 2024 (Doc. 48). On that date, he reported feeling sick and was permitted to go to Memorial Hospital in Belleville, Illinois. After the Defendant was discharged from Memorial Hospital, however, he did not return to The Center (Doc. 48). According to the Government's motion, the Defendant claimed that no one told him he had to come back to The Center (Doc. 48). However, personnel at The Center say they directed the Defendant to return from the hospital with his discharge paperwork (Doc. 48). The Center discharged the Defendant from its program on April 2, 2024 (Doc. 48).

At the bond revocation hearing, the Government also offered a proffer of evidence. According to the Government, when law enforcement went to the Defendant's residence to execute the arrest warrant that had been issued in connection with the motion to revoke, law enforcement conducted a protective sweep and witnessed controlled

substances in plain view. Law enforcement ultimately obtained a search warrant for the residence and, according to the Government, that search led to the seizure of 8.2 pounds of suspected marihuana, 18.2 grams of suspected cocaine, and boric acid, which the Government described as a "cutting agent" for cocaine. The Defense, for its part, noted that the Government's proffer of evidence was not accompanied by any reports, exhibits, or other documents.

## DISCUSSION

As previously noted, the Defendant conceded the alleged violation conduct in the Government's motion (except for the allegation surrounding fentanyl), which satisfies the first step in the bond revocation process. *See* 18 U.S.C. § 3148(b)(1)(A)-(B). Accordingly, the Court now turns to the second step in the process, which is guided by section 3148(b)(2). Under this section, the Court shall enter an order revoking a defendant's bond if, after a hearing, the Court finds that "based on the factors set forth in section 3142(g) . . . there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or [if the Court finds] the person is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(A)-(B).

At the hearing, the Government first noted that Probation made every effort to try and work with the Defendant while he was on bond and ultimately tried to address the root of the Defendant's problem by placing him in residential treatment. The Defendant ultimately left the treatment facility after a week and did not return. This conduct is ultimately what prompted the Government to file the instant motion to revoke. And then,

as noted above, at the time of his arrest, the Government made a proffer of evidence that the Defendant was found in possession of suspected marijuana and cocaine. The Government also focused on the Defendant's inability to have a functional and productive relationship with his Pretrial Services Officer. The Government referenced the violation reports regarding the Defendant, and that he has had an especially fraught relationship with Pretrial Services Officer Bruce-Oldham and the Pretrial Services Officer out of the Central District of Illinois who had been providing courtesy supervision to the Defendant.[1]

The Defense, for its part, recognized that the Defendant is an addict and because of that he has made poor choices while out on bond. But the Defense noted that the Defendant has not committed any violent conduct while on release; rather his conduct is harmful to himself and to his family. The Defense made an impassioned argument recommending the Defendant be placed back in residential treatment. The Defense noted that if there is something the Court can do for the Defendant – *i.e.*, place him in treatment – it should do so. And in the abstract, this ask by the Defendant is indeed an appealing proposition.

---

[1] The report signed by Officer Bruce-Oldham and dated April 4, 2024, reveals that the Defendant's relationship with Officer Bruce-Oldham had become not functional. This report was initially provided to the Government on April 4, 2024, and later to counsel for the Defendant. Accordingly, this is information that all parties were privy to at the bond revocation hearing, it was referenced by the Government and the Court will therefore consider it. On April 2, 2024, following the Defendant's discharge from The Center, Officer Bruce-Oldham had a conversation with the Defendant regarding his discharge from The Center. During this conversation, the Defendant refused to send requested paperwork, declined to accept that his failure to return to The Center was a bond violation, referred to Officer Bruce-Oldham as "baby" and told her that she is "going to look stupid in court."

However, the Court's task is to apply the facts before it and the arguments of counsel to the statutory framework it must follow. And the record before the Court, as a whole, leads it to the inescapable conclusion that the Defendant is "unlikely to abide by any condition or combination of conditions of release" and therefore his bond must be revoked. *See* 18 U.S.C. § 3148(b)(2)(B). From the outset, the Court notes that Probation did, indeed, attempt to address the heart of the issue with the Defendant by securing a placement for him in a residential treatment facility. And when the day finally arrived for the Defendant to report for treatment, he resisted and did not report at the time and date he was instructed to do so. It was only after his counsel intervened that the Defendant ultimately reported to The Center three hours late. The Defendant then lasted only one week at The Center before he left and declined to return.

In considering the Defendant's request for another opportunity at residential treatment, the Court believes the sequence of events is critical. After one week at The Center, the Defendant reported feeling sick and went to Memorial Hospital. He was permitted to go, but never returned. To date, it does not appear that the Defendant has ever provided Officer Bruce-Oldham with his discharge paperwork, as she requested. Moreover, the Court does not buy the explanation attributed to the Defendant in the Government's motion – *i.e.*, that he was *not* told he had to return to The Center. This simply does not ring true. Rather, it appears to the Court that the Defendant did not return to The Center because he simply had no interest in engaging in treatment. The Court has little confidence that the same or similar conduct won't repeat itself again this time. Indeed, the Court might see it differently had this been the case where the defendant

6

successfully completed residential treatment and then relapsed at some point thereafter. In those instances, a request for a second chance at residential treatment is a much more palatable option. But here, the Defendant refused to report at the time he was told to report, gave treatment only a week, left, and refused to return.

Additionally, the Defendant's fraught relationship with his Pretrial Services Officer bolsters the Court's conclusion that the Defendant is unlikely to abide by conditions of release. The Defendant's interaction with Officer Bruce-Oldham on April 2, 2024, as outlined in the April 4th report, demonstrates what appears to have devolved into an unproductive and adversarial relationship with supervision. During this conversation, the Defendant declined to send the discharge paperwork from the hospital that Officer Bruce-Oldham requested, he declined to accept that his failure to return to The Center was a violation of his bond conditions, referred to Officer Bruce-Oldham as "baby" and told her she will "look stupid in court." This is not the behavior that instills confidence in the Court that the Defendant will comply with the conditions his Pretrial Officer asks him to comply with. Rather, the relationship suggests it will be quite the opposite.[2]

And finally, the Court will address the Government's proffer that after the Defendant refused to return to The Center, he was ultimately arrested at a residence that, according to the Government, contained a significant amount of suspected marihuana and cocaine. The Defendant, for his part, countered that the only evidence before the

---

[2] The Defendant's initial refusal to report to The Center on the date and time he was instructed to do so is yet another example of the Defendant's unwillingness to comply with the directives of Probation.

Court on this topic is a proffer from the Government regarding uncharged conduct and the Court has not received any documents, exhibits, or reports regarding this arrest. The Court opts not to rely on this conduct in ultimately arriving at its conclusion to revoke the Defendant's bond.[3] Rather, the Defendant's refusal to return to The Center (after only one week there) and participate in residential treatment leads the Court to the conclusion that he is "unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(B). This conclusion is bolstered by the Defendant's adversarial and fraught relationship with Probation and his refusal to comply with their directives in the past while out on bond.

## CONCLUSION

For the reasons outlined in this Memorandum and Order, the Government's motion to revoke the Defendant's bond (Doc. 48) is **GRANTED**. The Defendant's bond is **REVOKED**.

It is **ORDERED** that the Defendant is **REMANDED** to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The Defendant must be **AFFORDED**

---

[3] Courts have held that it is appropriate to consider uncharged conduct in a detention hearing, and the Court believes it would likewise be appropriate to consider it in the context of a bond revocation hearing after an appropriate discussion of its reliability. *See e.g., United States v. Gaston*, No. 2:21-CR-36-JD-JPK, 2021 WL 1170201, at *6 (N.D. Ind. Mar. 26, 2021) ("Consistent with these decisions, the Court concludes that it is appropriate to consider uncharged conduct and hearsay in the detention analysis, but with a thorough examination of the reliability of such evidence."). But here, the Court simply does not find it necessary to rely upon the proffered information regarding uncharged criminal conduct, given the entire evidentiary picture before the Court. To be clear though, the Court makes no finding as to the reliability of the uncharged conduct proffered by the Government on the date of the Defendant's arrest.

a reasonable opportunity for private consultation with his attorney or any person hired by his attorney for the purpose of preparing a defense. On Order of a Court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**IT IS SO ORDERED.**

**Dated**: May 1, 2024

/s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**